## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CASE NO. 23-CR-125-RC** |
| | : | **CASE NO. 23-CR-320-RC** |
| **v.** | : | |
| | : | |
| **GRAHAM HAUCK,** | : | |
| | : | |
| **Defendant.** | : | |

### GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

Defendant Graham Hauck is a serial thief. Over a period of approximately five years, he stole approximately $2.5 million from clients who entrusted him with their organizations' assets. In July 2021, the FBI confronted him about stealing from Victim Organization One. Though he was less than fully forthcoming during that interview, he ultimately admitted that he stole from the organization. At the end of the interview, the FBI gave him a target letter, which would have deterred most people from engaging in additional criminal conduct. But not Hauck. He kept stealing. On February 28, 2023, the government conducted a reverse proffer for him and his attorney detailing its evidence against him regarding the theft from Victim Organization One. After that meeting, Hauck kept stealing. On May 10, 2023, he pleaded guilty to wire fraud before this Court, which released him on his personal recognizance with an order that he not violate any criminal laws. If ever there were a moment when it was crystal clear not to commit additional crimes, it was then. Hauck disregarded the Court's order and kept stealing. He even continued to steal after a May 24, 2023, meeting with the government, where he partially confessed to embezzling funds from additional clients.

Given his outrageous conduct and the benefits he already has received, the Court should sentence Hauck to eight years in prison followed by five years of supervised release. That sentence would be sufficient but not greater than necessary to accomplish the purposes of sentencing.

I.      **Background**

Graham Hauck enjoyed the type of privileged upbringing about which most defendants only can dream. His parents, brother, and he were close and got to travel frequently. He was never abused and has fond memories of childhood. *See* PSR ¶ 95-96. He graduated from a prestigious private D.C. school before attending Colgate University in upstate New York. PSR ¶ 118-119. Despite his lackluster performance at Colgate, he had a job waiting for him upon graduation working with his dad at Hauck and Associates ("H&A"), a trade association management firm that provided comprehensive administration services. PSR ¶ 127-128. Hauck became president of H&A in 2012. PSR ¶ 127.

No later than six years into his presidency, Hauck started stealing from clients. From 2018 to early 2019, he double billed Victim Organization Eight, an association that hired H&A to be its management company. PSR ¶ 53. In March 2019, the organization's executive director confronted Hauck about approximately $175,000 that was missing. Hauck quickly reimbursed the organization the full amount. *Id*.

Instead of being thankful that he escaped criminal liability and vowing to abstain from additional criminal conduct, Hauck kept stealing. He started stealing from Victim Organization One[1] no later than March 2019, the same general time that Victim Organization Eight's Executive Director confronted him about missing funds. This time, he stole at least $336,000. *See* PSR ¶ 30. As part of his scheme, he created inaccurate balance sheets, which he had an employee present to Victim Organization One's Board of Directors at monthly meetings. PSR ¶ 35. He also committed

---

[1]  In Case No. 23-CR-125, Victim Organization One was referred to as "the Victim Organization." Given that Hauck has now admitted to defrauding eight known victims, this memorandum will refer to the victim in Case No. 23-CR-125 as "Victim Organization One."

Aggravated Identity Theft, in violation of 18 U.S.C. § 1028A, when he signed his employee's name on a $100,000 check that he wrote in August 2019 from Victim Organization One's Capital One account payable to H&A. PSR ¶ 32. In September 2019, the employee emailed Hauck and flagged irregular activity with Victim Organization One's finances. Hauck, who was in Switzerland, falsely replied that he would look into the activity and "undue the errors," which he described as "certainly concerning." He knew full well that the irregular bank activity was a result of him stealing money. When the FBI interviewed him in July 2021, Hauck eventually admitted to misappropriating funds and to signing his employee's name on the $100,000 check. As part of his plea agreements, however, he avoided being charged with Aggravated Identity Theft, which carries a mandatory two-year prison term that must be served consecutively to any other sentence. *See* 18 U.S.C. § 1028A(b).

Victim Organization One reported Hauck's theft to the government, which resulted in an FBI investigation. When FBI agents showed up at Hauck's residence to interview him in July 2021, they were aware that he had stolen a substantial amount of money from Victim Organization One. They were unaware that he had stolen from other clients too, including Victim Organization Eight as noted above. By July 2021, Hauck had stolen more than a half-million dollars from those two organizations (though he promptly paid back Victim Organization Eight when confronted). As the government's investigation would later reveal, by July 2021 he had started stealing from other clients too. Yet during his interview with the FBI, Hauck said Victim Organization One was the only client to have this issue. At the end of the interview, the FBI gave Hauck a target letter. Hauck then did two things—he retained counsel, which is a common practice among those who receive target letters, and he kept right on stealing from clients.

In January 2023, undersigned counsel emailed Hauck's attorney to inform him that undersigned counsel had taken over the investigation for the government. Hauck and his attorney made themselves available on February 28, 2023, for a reverse proffer, in which the government detailed its evidence against Hauck with respect to the money he stole from Victim Organization One. At the end of the meeting, the government extended the same plea offer that had been conveyed to Hauck's lawyer by prior government counsel and followed up with formal plea paperwork on March 13, 2023. Twelve days after the government sent plea paperwork, Hauck was enjoying a vacation in Hawaii.

On May 10, 2023, Hauck pleaded guilty to one count of wire fraud in which he admitted to stealing hundreds of thousands of dollars from Victim Organization One. The Court released him on his personal recognizance and ordered that he "not violate federal, state, or local law while on release." ECF No. 8 at 1 (23-CR-125). The order noted, "While on release, if you commit a federal felony offense the punishment is an additional prison term of not more than ten years . . . . This sentence will be consecutive (*i.e.,* in addition to) any other sentence you receive." *Id.* at 4. Shockingly, the same day that he pleaded guilty and the following day too, Hauck stole even more funds, this time from Victim Organization Five. PSR ¶ 50.

On May 24, 2023, undersigned counsel and two FBI agents met Hauck at his lawyer's office to interview him. Hauck was in damage control mode, attempting to get in front of other clients contacting the government to report that he had stolen from them too. During that interview, Hauck admitted that he had stolen from Victim Organization Two, Victim Organization Three, Victim Organization Four, and Victim Organization Six. He denied stealing from any other clients during that meeting. He also denied stealing from any clients in the two weeks following his guilty

plea. Those two statements turned out to be patently false because Hauck started stealing from Victim Organization Five in approximately April 2021 and continued to steal from that organization even after his May 10, 2023, guilty plea. He stole more than $25,000 from the organization after his guilty plea, and continued to steal from it even after his May 24, 2023, meeting with the government. *See* PSR ¶ 50.

On May 25, 2023, Victim Organization Two's counsel contacted the government and included a link to the May 10, 2023, press release announcing Hauck's guilty plea. Counsel indicated that Victim Organization Two had just figured out that Hauck stole hundreds of thousands of dollars from it too. Five days later, counsel for Victim Organization Three contacted the government reporting similar information.

On June 12, 2023, Victim Organization Five asked its former president, who stepped down from that role in 2021, to be its treasurer to gain access to various accounts and work with Hauck to separate the organization from H&A. The organization's annual conference was coming up in July 2023. Although members paid registration fees for the conference online, the treasurer had difficulty seeing where the fees were going. He ultimately determined that the fees were going to a Stripe account about which the organization was unaware. After the organization finally gained access to the account, it determined that approximately $131,000 in registration fees had gone to accounts that appeared to belong to H&A. The treasurer had been regularly communicating with Hauck until approximately August 21, 2023. When the treasurer asked Hauck about the $131,000, Hauck became nonresponsive. As the government's investigation revealed, Hauck did indeed misappropriate registration fees, directing them from Stripe to his Bank of America account and H&A's Truist account.

On September 14, 2023, after the government brought Hauck's post-plea criminal conduct to the Court's attention, the Court revoked his bond.

On September 19, 2023, Hauck pleaded guilty to one count of bank fraud. The Statement of Offense summarized how he engaged in additional criminal conduct with respect to Victim Organizations Two through Eight. In total, when factoring in the theft from Victim Organization One, he admitted to stealing approximately $2.5 million from his former clients. The Statement of Offense describes some of the ways he camouflaged his criminal conduct, which included falsifying balance sheets and using a foreign exchange and international payment services company to conceal fraudulent transactions. *See* ECF No. 6 at ¶ 8, 12, 14 (23-CR-320).

As part of his second plea agreement, Hauck agreed to be interviewed by the government and truthfully answer questions about his criminal conduct and finances. ECF No. 5 at 3 (23-CR-320).  He also agreed to provide the victim organizations with access to their files and accounts. *Id.* at 13.

On December 19, 2023, Hauck was interviewed by the government. He has not fully satisfied all requests from victims with respect to requested information/materials but appears to have limited additional information at this time.

## II.   Sentencing Guidelines

The parties and probation officer who prepared the PSR agree that the two offenses group and the following guidelines apply.

| USSG § 2B1.1(a)(1) | Base Offense Level | 7 |
| USSG § 2B1.1(b)(1)(I) | Loss Amount: $1,500,001-$3,500,000 | 16 |
| USSG § 2B1.1(b)(2)(A)(iii) | Substantial Financial Hardship to 1 or More Victims | 2 |
| USSG § 2B1.1(b)(2)(10)(c) | Offense Involved Sophisticated Means | 2 |
| USSG § 2B1.1(b)(2)(17)(A) | Defendant Derived more than $1 million in Gross Receipts from 1 or More Financial Institutions | 2 |
| USSG § 3B1.3 | Abuse of Position of Trust | 2 |

*See* PSR ¶ 73-82.

The probation officer does not believe the defendant is entitled to acceptance of responsibility credit given that he engaged in additional criminal conduct after his first guilty plea. PSR ¶ 83 and p. 40; *see* USSG § 3E1.1, comment. (n.1(B)) (voluntary termination or withdrawal from criminal conduct). If the defendant had only pleaded guilty in Case No. 23-CR-120, the government agrees that he would have forfeited his right to acceptance credit given the additional criminal conduct that followed that plea. However, because there is no evidence that he engaged in additional criminal conduct following his guilty plea to bank fraud in September 2023, consistent with that plea agreement, the government requests that the Court award him acceptance credit.

The defendant is in criminal history category I. PSR ¶ 88. Accordingly, if he is awarded acceptance credit, his offense level is 28, resulting in a recommended guidelines range of 78 to 97 months. If he does not receive acceptance credit, his offense level is 31, resulting in a recommended guidelines range of 108 to 135 months.

## III.    The 18 U.S.C. § 3553(a) Factors

The Court must impose a sentence that is sufficient but not greater than necessary to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment, to afford

adequate deterrence, to protect the public from further crimes of the defendant, and to provide the defendant with needed educational or vocational treatment. 18 U.S.C. § 3553(a)(2). The Court also must consider the history and characteristics of the defendant, the kinds of sentences available, the sentencing range under the guidelines, any relevant policy statements, the need to avoid unwarranted sentencing disparities, and the need to provide restitution to the victims. 18 U.S.C. § 3553(a)(1)-(7).

### A.    The Nature and Circumstances of the Offense and the Need for the Sentence to Reflect the Seriousness of the Offense

The defendant's fraud was extensive, sophisticated, and serious. His criminal conduct was not limited to just one day, one week, or even one year. On the contrary, over the course of approximately five years, he consciously decided to steal from his clients over and over and over again.

He stole organization's money, their reputations, and their members' time. He did all of this (1) *even after* the FBI interviewed him about Victim Organization One, (2) and *even after* the government conducted a reverse proffer session for him, (3) and *even after* he received formal plea paperwork, and (4) *even after* he pleaded guilty to wire fraud before this Court and had the audacity to flag for the Court his anticipated upcoming work-related travel plans knowing full well that he had looted not just one client's finances but seemingly all or almost all his clients' finances, (5) and *even after* he met with the government following his first guilty plea for the supposed purpose to fess up to all his additional criminal conduct.

His conduct is nothing short of shameful. He has caused irreparable damage to almost all the victims in this case as highlighted by some of their victim-impact statements.

Victim Organization Two is dedicated to improving the lives of people affected by cancer.

After it appointed H&A to manage its operations, Hauck treated the organization's finances as a personal slush fund. Over a two-year period, he stole almost $900,000. Victim Organization Two's president noted that since discovering the devastating fact that most of its funds had been depleted and the financial statements that H&A had presented to its members were fraudulent, the organization has been "grappling with a financial and existential crisis."    *See* Victim Organization Two's Victim Impact Statement at 1. Hauck's actions left the organization "in the terrible position of not being able to pay our bills, and having to inform all these contributors of the fraud." *Id*. Hauck pocketed a generous donation from a private foundation to create the organization's clinical practice guidelines. *Id*. The organization's executive committee has been forced to manage its daily affairs because it can no longer afford to hire a management company. As a result, it has had to postpone "significant initiatives, such as the development of our next guidelines on integrative medicine approaches for insomnia among cancer patients[.]" *Id*. at 2. Sadly, but not surprisingly, the organization's members have been traumatized by Hauck. The president noted that "it has been difficult to comprehend how someone could misappropriate funds from a nonprofit charity organization dedicated to helping people with cancer worldwide." *Id*.

Victim Organization Five is uncertain about the total extent of Hauck's theft, but believes the best estimate is that he stole more than $160,000. "This loss represents more than half of the Society's assets." *See* Victim Organization Five's Victim Impact Statement. "The Board and Executive of the Society have worked assiduously for the past 10 years to establish the financial security of the Society. The actions of Mr. Hauck have removed this at a stroke." *Id*. For thirteen years, the organization worked with Hauck, and noted that it treated him with respect and kindness. It even awarded him "an ex gratia payment of $10,000 in 2021 in recognition of his firm's loss of

income due to the Covid-related cancelling of our biennial Congress." *Id*. He repaid the organization's kindness by stealing from it and conveyed to the Court that he has no respect for the law when he continued to steal from the organization after pleading guilty to stealing from Victim Organization One.

With respect to Victim Organization One, a nonprofit association that has existed for more than 30 years, its president wrote, "Hauck's dishonesty, greed, and concealment nearly financially ruined" the organization. ECF No. 19 at 6 (Case No. 23-CR-125). The organization's president also noted that Hauck caused "operational chaos and injury" during the pandemic and brought great shame to the organization. *Id.* at 7. Hauck engaged in this conduct notwithstanding H&A's long-standing relationship with the organization and being paid nearly $150,000 by the organization to manage its affairs in 2019. *Id.* at 6; PSR ¶ 28.

Given the nature and circumstances of the offense and seriousness of Hauck's conduct, an eight-year sentence is warranted.

**B.    The Need to Promote Respect for the Law and to Deter the Defendant and Others from This Type of Criminal Conduct**

Hauck has not shown any respect for the law beginning with the moment Victim Organization Eight confronted him about missing funds in 2019 and continuing through the summer of 2023 when he continued to steal after pleading guilty before this Court. Contrary to his sentencing memorandum's assertion, he already has demonstrated a propensity to recidivate. Thus, an eight-year prison sentence is appropriate not only to promote respect for the law and to deter others from engaging in this type of criminal conduct, but also to specifically deter him.

After Victim Organization Eight confronted Hauck in March 2019, he quickly paid back the stolen money. Instead of breathing a sigh of relief that he was not prosecuted criminally for

that transgression and thinking, "I dodged a bullet; I'm never going to do something like that again," he simply moved on to his next victim, and then the next, and then the next, behaving like a butcher keen on financially slaughtering his clients.

The defense contends that recidivism rates decline relatively consistently as age increases, and notes that "with respect to Mr. Hauck, [defendants who are] 50 years old [with] a criminal history category of I have a recidivism rate of only 6.2%."  ECF No. 33 at 19 (23-CR-125). The defense also notes that "only 3.5% of first offenders with zero criminal history points are ever reconvicted." Finally, the defense argues, "There is, quite simply, nothing in the record to make this Court reasonably believe that Mr. Hauck would commit any criminal offense in the future." *Id.*

Hauck was in his late 40s when the FBI interviewed him about stealing from Victim Organization One, yet he continued to commit crimes. He was 50 when he pleaded guilty to wire fraud in May 2023. Neither experience remotely deterred him from engaging in additional criminal conduct. Instead, even after his guilty plea, he stole more than $25,000 from yet another client. Thus, contrary to his assertion that the record lacks any evidence to make this Court reasonably believe that he will commit additional criminal offenses in the future, given that he has spent the last 15 percent of his adult life stealing from clients, i.e., when he was in his late 40s and 50, there is ample evidence that he might steal from people if he is ever in a position to access others' financial accounts again. A lengthy sentence is needed to specifically deter him.

A lengthy sentence also is necessary to deter others who might embark on the journey that Hauck traveled. The Court should send a clear message that if you steal more than $2 million from eight different clients *and* continue to steal after law enforcement confronts you *and* after you

11

plead guilty before a federal judge, your conduct will not result in only having to serve a few years in prison.

### C.    The History and Circumstances of the Defendant

Hauck enjoyed the type of childhood that most defendants in this courthouse would not even be able to fathom, let alone experience. He was raised in a financially prosperous household by loving parents who ensured that he got to take vacations, attend one of the finest private high schools in D.C., and go to a prestigious university in New York. Based on the letters of support submitted in connection with his sentencing memorandum, he also has been blessed with wonderful friends and loving relationships throughout his whole life as well.

Although he clearly faced certain financial pressures, which seemed to motivate him at least in part to raid his client's finances, his conduct in this case is reprehensible. There were so many opportunities for him to exit the embezzlement highway. He could have done it when he was confronted by Victim Organization Eight in 2019. He could have done it when he was confronted by Victim Organization One about its missing funds. He could have done it when the FBI interviewed him in July 2021. He could have done it when he received plea paperwork in the wire fraud case. He could have done it when he pleaded guilty in May 2023. He could have done it when he met with the government two weeks later to purportedly confess to all his additional embezzlement activity. But he repeatedly stayed the course.

Between September 2021 and June 2023, while Hauck was financially decimating his victims, records from Truist and Bank of America show him making payments totaling approximately $74,000 to his Maryland country club.

On March 25, 2023, twelve days after the government sent Hauck's counsel plea paperwork in the wire fraud case, Hauck appeared in a photo on his spouse's Instagram page, where he was vacationing with his family in Hawaii.



Although the letters submitted on his behalf describe a wonderful person, and there is no doubt that he has positively touched the lives of many and is unquestionably likable, those letters don't warrant a sentence below the guidelines.

### D.   Unwarranted Sentencing Disparities

The District of Columbia Circuit has recognized that there will "inevitably . . . [be] sentencing disparities and inequities that can be explained by little more than the identities of the sentencing judges." *United States v. Gardellini*, 545 F.3d 1089, 1096 (D.C. Cir. 2008); *see also*

*United States v. Saez*, 444 F.3d 15, 19 (1st Cir. 2006) ("[W]ith different judges sentencing two defendants quite differently, there is no more reason to think that the first one was right than the second."). The Guidelines "reduce unwarranted federal sentencing disparities," *Freeman v. United States*, 564 U.S. 522, 525 (2011), by "creat[ing] a comprehensive sentencing scheme in which those who commit crimes of similar severity under similar conditions receive similar sentences." *Id.* at 533.

A sentencing court "necessarily g[ives] significant weight and consideration to the need to avoid unwarranted disparities" by "correctly calculat[ing] and carefully review[ing] the Guidelines range." *Gall v. United States*, 552 U.S. 38, 54 (2007). "[I]mposing a within-guidelines sentence is the surest way to avoid unwarranted disparities." *United States v. White*, 737 F.3d 1121, 1145 (7th Cir. 2013).

> **E.    A Sentence Below the Guidelines Contemplated by the Parties in the Plea Agreement is Unwarranted**

An eight-year prison sentence is appropriate in this case.

Hauck already has received several benefits with respect to the resolution of this case. First, although the Court will make the final determination regarding the guidelines and may decide not to award him three points acceptance credit given the facts of the case, the government has recommended that the three points be awarded. The recommended guidelines range for wire fraud and bank fraud, without acceptance credit, is 108 to 135 months, compared with the parties' recommended range of 78 to 97 months. That is a significant difference.

Second, Hauck's criminal conduct and the manner that he moved funds would support a money laundering conviction under 18 U.S.C. § 1956. If he had been convicted of money laundering under section 1956, his total offense would have increased by two levels pursuant to

USSG § 2S1.1(b)(2)(B). Even with acceptance credit, his recommended range for a money laundering conviction would have been 97 to 121 months. Without acceptance credit, his recommended range would have been 135 to 158 months.

Third, he was not required to plead guilty to Aggravated Identity Theft as part of a plea, which would have carried an obligation that the Court impose a two-year sentence to be served consecutively to any other sentence.

Fourth, even though he clearly committed a federal felony while on release in the wire fraud case, the government did not seek the enhanced penalty provided in 18 U.S.C. § 3147.

Hauck also lied to the FBI multiple times, first in July 2021 and then in May 2023. The government does not believe his lies rise to the level of warranting a two-point obstruction enhancement under USSG § 3C1.1, but they should be considered by the Court in fashioning its sentence, especially the May 2023 lie, which was designed to give Hauck an opportunity to come clean about his criminal conduct, not to further obfuscate.

Based on his individual circumstances and the facts of this case, a sentence within the 78-to-97-month range is appropriate. Moreover, a sentence near the very top is warranted. A sentence of eight years in prison, or 96 months, would send a clear message not just to Hauck, but to other would-be fraudsters, that engaging in the sort of conduct that Hauck did during the approximately five-year period in question will be met with a stern, yet entirely fair sentence.

## IV.     Restitution and Forfeiture

The government requests that the Court order restitution as set forth in paragraphs 206 and 207 of the final PSR. The government also requests that, pursuant to 18 U.S.C. § 3664(j)(1), the judgments include an instruction that Victim Organizations One, Two, Three, Four, Five, Six, and

Seven should be paid on a pro rata basis until they recover in full before the insurance company referenced in paragraph 206 is paid. *See United States v. Baldwin*, 389 F. Supp. 2d 1, 4 (D.D.C. 2005) (concluding that in accordance with section 3664(j)(1), "all restitution must be made first to the direct victims of the fraud . . . before restitution can be made" to an insurance company that compensated a victim for its loss).

The government also requests that the Court orally reference the consent orders of forfeiture at sentencing and include them in the judgments. ECF No. 10 (23-CR-125); ECF No. 7 (23-CR-320).

## **CONCLUSION**

For the reasons noted above, the government respectfully requests that the Court sentence defendant Graham Hauck to eight years in prison, i.e., 96 months, followed by five years of supervised release.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

By:      */s/ Kondi J. Kleinman*
KONDI J. KLEINMAN
California Bar No. 241277
Assistant United States Attorney
Fraud, Public Corruption & Civil Rights Section
601 D Street, N.W. | Washington, D.C. 20530
(202) 252-6887 | Kondi.Kleinman2@usdoj.gov